UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
FELIX HERNANDEZ,                         : 14 Civ. 8437 (PAC) (JCF)
                                         :
                Petitioner,              :        REPORT AND
                                         :        RECOMMENDATION
        - against -                      :
                                         :
ANTHONY J. ANNUCCI, Acting               :
Commissioner, DOCCS,                     :
                                         :
                Respondent.              :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:

     The petitioner, Felix Hernandez, is facing removal from the
United States as a consequence of having pled guilty eight years
ago to Sexual Abuse in the First Degree, in violation of New York
Penal Law § 130.65(2).  Mr. Hernandez has filed a petition for a
writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his
conviction on the ground that his attorney rendered ineffective
assistance by failing to advise him of the possible immigration
consequences of a conviction.  For the reasons that follow, I
recommend that the petition be denied.

Background

     A. State Criminal Proceedings

     The petitioner was born in the Dominican Republic on September
26, 1969, and moved to Puerto Rico in 1990.  (R. at 363-64).[1]  In

_____

     [1] "R." refers to the state record.

1

1993, he married Liliana Perez Vega, who subsequently gave birth to two sons. (R. at 364). Mr. Hernandez received temporary residence in 1994 and permanent residence in 1997. (R. at 364-65). After his wife died, the petitioner and his sons moved to New York, where he married Virginia Hernandez. Together they had four children. (R. at 365).

According to the prosecution, the incident at issue occurred in the early morning of December 18, 2006. (R. at 542, 561). C.H.,[2] the petitioner's eighteen year old sister-in-law, was sleeping in the petitioner's apartment next to his eight year old daughter. (R. at 542-43). C.H. alleges that Mr. Hernandez tried to rape her -- rubbing her vagina over her pants, grabbing her breast, trying to kiss her, telling her he wanted to make love to her. (R. at 542). The alleged assault ended when C.H. yelled out to her sister, Virginia, who was asleep in another room. (R. at 381, 542). C.H. reported the episode to the police later that day. (R. at 543).

The petitioner was arrested two months later, in February 2007. (R. at 545). After waiving his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), he denied C.H.'s allegations orally and in writing. (R. at 562, 567, 569). He signed a

---

[2] The respondent has requested that the victim's identity be protected and the state court records be placed under seal.

2

statement saying that he was attempting to talk to C.H. about a situation that occurred while he was away in Puerto Rico, when she left her boyfriend in the apartment alone with his wife and "inappropriate contact" ensued. (R. at 544, 569). He made no mention of touching C.H., but stated that she "said a lot of things in English . . . that [he] did not understand and she hit [him]." (R. at 569). He tried to hold her and told her he loved his family but was worried about what happened between the boyfriend and his wife. (R. at 569). He then went to bed. (R. at 569). A New York County grand jury charged the petitioner with Attempted Rape in the First Degree in violation of New York Penal Law §§ 110.00, 130.35(1), Attempted Sexual Abuse in the First Degree in violation of Penal Law §§ 110.00, 130.65(1), and two counts of Sexual Abuse in the First Degree in violation of Penal Law § 130.65(1), (2). (R. at 30-32).

Mr. Hernandez moved to suppress his statements to the police, and a hearing was held before New York State Supreme Court Justice Edward McLaughlin. Detective John Savino, who investigated the allegations of sexual assault, testified about the February 21, 2007, interrogation of the petitioner. (R. at 264-67). The petitioner had recounted his version of events, stating that he was "annoyed" with C.H. for bringing a man to his home and leaving the man alone with his wife while he was in Puerto Rico. (R. at 274).

3

After arguing with his wife about the incident, Mr. Hernandez found C.H. and shook her to wake her up.  (R. at 274).  After C.H. started screaming for the petitioner to stop and not to touch her, she stood up and tried to scratch him.  (R. at 274).  Mr. Hernandez told C.H. that he loved her like his own children, and may have tried to hold C.H..  (R. at 274).  The interview lasted approximately forty minutes, after which the petitioner signed a statement.  (R. at 275-77).

The court recessed for lunch during Detective Savino's direct testimony.  Once proceedings resumed, counsel for petitioner announced that "after . . . the direct testimony of the officer," his client wanted to enter a guilty plea to sexual abuse in the first degree.  (R. at 278).  Justice McLaughlin asked Mr. Hernandez, through a Spanish interpreter, if he understood he was pleading guilty to a felony, whether he understood he was being convicted for the incident on December 18, 2006, at about 5:15 a.m. inside an apartment at 55 East 99th Street, and if he indeed had committed the felony to which he was pleading guilty.  (R. at 278-79).  The petitioner responded affirmatively to each question.  (R. at 278-79).

Justice McLaughlin asked the petitioner, "[D]o you understand that by pleading guilty, you are saying you're guilty, the same way as if a jury had been assembled and they said you're guilty, do you

4

understand they both mean the same thing?" (R. at 280). Mr. Hernandez replied, "Yes." (R. at 280). Justice McLaughlin told the petitioner, "[Y]ou were charged with a higher crime, where the maximum there would be 15 years; the minimum seven. You've been given a chance to plead guilty to the lesser charge . . . ." (R. at 280-81). The judge explained that if Mr. Hernandez pled guilty, "the sentence is going to be that minimum sentence of five years plus five years post-release supervision. Do you understand that?" (R. at 281). The petitioner replied, "Yes." (R. at 281). Justice McLaughlin then stated that the petitioner was also charged with violating probation, and that he would impose a sentence on the probation violation to be served concurrently with the sentence for sexual abuse. (R. at 281). The petitioner replied that he understood. (R. at 281).

After conferring with counsel, Mr. Hernandez executed a waiver of appeal. (R. at 283). Justice McLaughlin explained that defendants generally have the right to appeal a conviction, but that the petitioner was giving up that right in exchange for his plea to a lesser charge. (R. at 283-84). The petitioner stated that he understood. (R. at 284).

Thereafter, Justice McLaughlin stated, "I am a mere New York State official. I have no idea what any federal immigration situation would be as a result, if any, of this conviction, but I

am suppose[d] to tell you that as well." (R. at 284). Justice McLaughlin adjudicated Mr. Hernandez a predicate felon, as Mr. Hernandez admitted that he had been convicted in 2002 of assault in the second degree in violation of Penal Law § 120.05(2), which is a violent felony as defined in Penal Law § 70.02(1). (R. at 285-86). On November 29, 2007, he was sentenced to a determinate prison term of five years, followed by five years of post-release supervision. (R. at 288-91).

    B. <u>Post-Conviction Proceedings</u>

On July 18, 2008, Mr. Hernandez appeared <u>pro</u> <u>se</u> by video before a United States Immigration Judge in New York City. (R. at 300). When asked if he had been convicted of first-degree sexual abuse, the petitioner replied, "It was an error of the court." (R. at 303). The Immigration Judge repeated the question, to which the petitioner answered, "Yes, unfairly." (R. at 303). Mr. Hernandez also acknowledged that he was sentenced to five years in prison. (R. at 303). The Immigration Judge then stated that he had consulted with the Appellate Division, which confirmed that the petitioner had not filed an appeal. (R. at 304). The Immigration Court found that the petitioner's conviction was final for immigration purposes and that he had been convicted of a crime of violence. (R. at 304). The Immigration Judge ordered that Mr. Hernandez be removed to the Dominican Republic. (R. at 308, 315).

After this hearing, Mr. Hernandez filed a late notice of appeal in connection with his conviction, which the Appellate Division deemed timely. (Memorandum of Law in Support of Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Pet. Memo.") at 10 n.2). He then moved to reopen and terminate his immigration proceedings, arguing that his conviction was not final for immigration purposes. (Pet. Memo. at 10 n.2). That unopposed application was granted. (Pet. Memo. at 10 n.2).

On February 28, 2011, the petitioner, through counsel, moved to vacate the judgment of conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10. (R. at 292). Mr. Hernandez argued that his attorney had been ineffective because he did not inform the petitioner that he would be subject to automatic deportation as a result of pleading guilty to first-degree sexual abuse. The petitioner claimed that had he been aware of the immigration consequences of the plea, he would have tried to obtain a plea to a count with less severe immigration consequences, or else he would have proceeded to trial. (R. at 292-97, 319-29). The prosecution opposed the motion, arguing that: (1) aside from his conviction in this case, the petitioner was subject to deportation because of a prior conviction for second-degree assault, which concerned a domestic violence incident; (2) Mr. Hernandez did not demonstrate that he would have proceeded to trial had he known of the immigration

consequences of his plea; (3) the immigration consequences of the guilty plea were unclear, but the petitioner's trial counsel had generally advised him of them; and (4) the trial judge warned the petitioner that he faced the risk of immigration consequences as a result of his plea. (R. at 331-43).

On June 23, 2011, Justice McLauglin held a hearing on the petitioner's motion to vacate. At the hearing, Joseph Schioppi, the petitioner's trial attorney, testified that he did not recall advising Mr. Hernandez the about the immigration consequences of his guilty plea. (R. at 358-59). He stated that, "[u]nless the issue arose at some point during the proceedings," he "would not make it a practice to discuss immigration consequences," although he had since begun advising clients who were not citizens that their pleas could be used for deportation purposes. (R. at 360-61).

Mr. Hernandez testified about his prior criminal history. Although he had previously pled guilty to second degree assault for accosting his brother-in-law, he denied that he had started the fight that led to the charges. (R. at 29, 377-78). Rather, he claimed that he was merely defending himself and that, "when [they] were fighting, [his brother-in-law] hit himself against the wall with his head." (R. at 369). He admitted that he nevertheless pled guilty to the crime. (R. at 378). Mr. Hernandez further

testified that orders of protection forbidding him to have contact with his former wife, Virginia, were based false charges she made about domestic violence incidents. (R. at 379-80).

Regarding the events of December 18, 2006, Mr. Hernandez claimed that he and his wife returned from eating out and C.H. answered the door. (R. at 370, 380). He said he wanted to talk to her, but his wife argued with him and took him to another room. (R. at 370). After his wife calmed down, he returned to C.H., who was in a room with his six sleeping children. (R. at 370, 382). She denied being the person who invited her boyfriend to the house, blaming Virginia. (R. at 371). Mr. Hernandez then told her he "didn't want her in the house," and after she talked back, "grabbed her between her pants and her blouse, . . . took her to the door, and she left." (R. at 371-72). He insisted that it was not true that C.H. woke up and tried to move away from him or that he tried to kiss her and rub her breasts, despite her telling him to "let go." (R. at 381). The petitioner claimed he did not touch C.H.'s breasts or vagina, did not touch her for sexual pleasure, and did not try to rape her. (R. at 372, 381). After Mr. Hernandez's arrest, his two oldest children went to live with his sister, and Virginia "handed" petitioner's four other children "over to the City." (R. at 367-68).

Mr. Hernandez stated that he pled guilty to first-degree

sexual abuse "because [he] was going to get 15 years," and he "didn't want to be away from [his] children for a long time." (R. at 372, 384, 393). The petitioner asserted he "never spoke" to his attorney about deportation. (R. at 372). Because he was a permanent resident, he "never thought that immigration was going to have anything to do with" him. (R. at 373). The petitioner stated that, had he known that his guilty plea would lead to deportation, he would "never" have pled guilty, "because [he] was going to be left without [his] children." (R. at 373). Mr. Hernandez said he had agreed with everything that the judge said at his plea allocution only because his attorney told him "to just respond yes." (R. at 373). The petitioner then acknowledged that some of his admissions during his plea allocution were not true. (R. at 392).

Mr. Hernandez recalled that the judge asked him if he "subjected [C.H.] to what's known as sexual contact . . . and did that without her consent by virtue of the fact that she was asleep," and petitioner answered that he had, "[b]ut there was a mistake here in the court. When I grabbed her, I didn't know what sexual contact was. The guys [in jail] had told me that just touching a woman would be sexual contact, so that's why I said for me that's what they were referring to. That's what was a mistake." (R. at 385-86). The petitioner claimed to believe that "after you

touch a woman or grab her, that's sexual contact. That's what I thought, and that's what they say inside in jail." (R. at 386). Mr. Hernandez learned of his "mistake" in late 2007, when he went to state prison. (R. at 387). Shortly thereafter, in 2008, he "put in a motion" so he could "explain what happened." (R. at 388).

The petitioner also claimed he "didn't understand what a trial was," and his lawyer did not explain it to him. (R. at 389-90). Mr. Hernandez had heard some witness testimony, and he knew that the trial would commence after the hearing. (R. at 390). He further testified that did not remember seeing paperwork related to his case before the hearing. (R. at 390).[3]

The petitioner's son, Felix Hernandez, Jr., who was seventeen years old at the time of the hearing, testified that had lived with Mr. Hernandez until his arrest in this case and that the petitioner was an involved and caring parent. (R. at 398-400).

On July 7, 2011, Justice McLaughlin rendered an oral decision on the petitioner's motion. He found that first-degree sexual

---

[3] After hearing that testimony, the court remarked that "all that paperwork was given from the prosecutor" to defense counsel the morning of Mr. Hernandez's suppression hearing and subsequent guilty plea. (R. at 393). The court file contains a discovery list, which was signed by defense counsel and dated November 7, 2007, the date of the suppression hearing. The court file also contains a witness list, which includes C.H., Virginia Hernandez, and the petitioner's daughter who was asleep beside C.H. at the time of the assault. (R. at 83-84).

abuse was an "automatic deportable charge," and although he determined that defense counsel "did speak to [petitioner] about immigration, notwithstanding anything the [petitioner] said to the contrary," Justice McLaughlin also ruled that counsel's statement "did not have the clarity and the certitude that was available to [counsel] to locate and to communicate." (R. at 435).   The advice was thus inadequate, "given the immutable certitude that this conviction will lead to deportation."   (R. at 435).   Justice McLaughlin further found that his own "warning . . . was inadequate to solve a problem created by a vague or general announcement by a lawyer." (R. at 435).

Justice   McLaughlin   therefore   found   that   counsel's representation was flawed, but ultimately denied the petitioner's claim because Mr. Hernandez did not establish that he was prejudiced.   Justice McLaughlin "reject[ed] as incredible [the petitioner's] contention that if he were properly warned, he would not have pled guilty."   (R. at 436).   He reached this conclusion "in the context of all of the false statements that [the petitioner] made during [the] hearing under oath."   (R. at 437). Justice McLaughlin cited "various factual disagreements which [he] found inherently incredible and incredible as delivered," including the petitioner's statement that he did not know the meaning of the words "sexual contact," which the judge found to be "positively

Clintonesque," and Mr. Hernandez's claim that he did not know the meaning of an oath, which Justice McLaughlin characterized as "[p]oppycock" and "[b]alderdash."  (R. at 437-40).

Justice McLaughlin found it significant that the petitioner had decided to plead guilty during the lunchtime recess of his pre-trial hearing:

> A person getting that close to a jury[] getting itself involved in a case has to figure out whether or not he's going to be convicted, what's likely to occur both here in the U.S. and then in his own country.
>
> While it may sound odd, it may sound insensitive . . . , when you're faced with being convicted, because factual guilt was, from the defendant's standpoint, seemingly, if not overwhelming, then compelling.  So within a day or two of being convicted, he says I'm taking the five years, I'm pleading guilty.
>
> His choices at that point during lunch were seemingly face significantly, as Judge Scherer had announced to him, significantly more than five years, and then being deported.  Conviction did not seem at that point to be anything other than a certainty.
>
> Up until the time that the hearing began, it could well have been that the defendant was hoping that the relative by blood [sic] whom he's admitted to me sexually abusing would not appear.  Familial interaction being what it is, familial pressure being what it is, it is well possible that he entertained the hope that she would not appear, that family circumstances would intervene to prevent her appearance, but, in my opinion, something clearly changed during the lunch period when he came back and pled guilty.

(R. at 437-38).  The judge concluded that the petitioner understood that deportation was a "certainty" and that he faced a choice of deportation following a five-year prison term on a guilty plea or

13

deportation following a fourteen-year prison term on a conviction after a jury trial.  (R. at 437-39).  The court found that petitioner "chose to accept the five years and then the deportation rather than the anticipated longer sentence and then deportation[], and that nothing the lawyer said or didn't say would have changed that decision." (R. at 441-42).  Justice McLaughlin reasoned that the petitioner realized that, regardless of whether he pled guilty or went to trial, "the children [were] not going to be in his life as he would like them to be." (R. at 439).  Based on the judge's observation of the petitioner and of his interactions with his son, he questioned Mr. Hernandez' "family fealty," characterized the decision to plead guilty as "the trumping of self-interests over the feigned or real familial interaction," and stated that he was "satisfied" that the petitioner "knew it was in his best interests to take the five years" and "suffer the deportation." (R. at 439, 441).  On July 8, 2011, Justice McLaughlin issued a written decision finding that the petitioner "has not satisfied the prejudice prong of Strickland[4] because he failed to establish a reasonable probability that adequate immigration advice would have altered his decision to plead guilty." (R. at 443).

---

[4] In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Supreme Court laid out the two-prong test for constitutional claims of ineffective assistance of counsel, which requires the defendant to "show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."

The petitioner sought leave to appeal the denial of the motion, and on October 11, 2011, the Appellate Division, First Department, granted his request and consolidated his § 440.10 appeal with the direct appeal from his conviction. (R. at 119). The petitioner argued that he was prejudiced by his trial counsel's failure to inform him of the immigration consequences of his guilty plea. (R. at 120-69).

On August 21, 2012, the Appellate Division, with two justices dissenting, summarily affirmed the decision of the New York County Supreme Court. People v. Hernandez, 98 A.D.3d 449, 950 N.Y.S.2d 268 (1st Dep't 2012). Justice Sweeny (joined by Justice Saxe) and Justice Manzanet-Daniels concurred in separate memoranda. Id. at 449-51, 950 N.Y.S.2d at 268-70. Justice Sweeny concluded that "the hearing court correctly determined that the first prong of the Strickland test had been met" because the petitioner demonstrated that his counsel failed to advise him of the immigration consequences of his plea. Id. at 449-50, 950 N.Y.S.2d at 268. However, the petitioner "did not establish that he was prejudiced by his counsel's inadequate advice on the deportation consequences of his guilty plea." Id. at 450, 950 N.Y.S.2d at 268. Justice Sweeny observed that the hearing court had rejected the petitioner's testimony that, had he been advised that he would be deported, he would have rejected the promised five-year sentence

15

and insisted on going to trial, knowing that he potentially faced fourteen years' imprisonment. Id., 950 N.Y.S.2d at 268. Justice Sweeny pointed to various examples of the petitioner's "lack of candor," including his statements to the immigration authorities that he was unjustly convicted and that he did not commit the crime to which he had pled guilty, and his claims that he did not understand the terms "trial," "sexual contact," or "oath." Id., 950 N.Y.S.2d at 268-69. Justice Sweeny concluded that "[t]he record amply supports the hearing court's conclusion that [the petitioner] decided to accept the plea, not because he was defectively advised on the immigration issue, but rather because pleading guilty was the course most advantageous to him." Id., 950 N.Y.S.2d at 269.

Justice Manzanet-Daniels found Mr. Hernandez "utterly disingenuous and dishonest when discussing this case and his prior convictions." Id., 950 N.Y.S.2d at 269. She stated that the petitioner's claimed misapprehension that sexual contact encompassed any contact with a woman "defies common sense and the record evidence," and was "palpably ridiculous." Id. at 451, 950 N.Y.S.2d at 269. Justice Manzanet-Daniels further noted that Mr. Hernandez could not demonstrate prejudice because he was deportable as a result of his former conviction for second degree assault. Id., 950 N.Y.S.2d at 269.

Justice Freedman, joined by Justice Moskowitz, dissented, concluding that the petitioner had demonstrated prejudice.  The dissent found that petitioner's testimony established that "he was unaware of the immigration consequences when he pleaded guilty, and he took the plea because he thought doing so was the best way to minimize his separation from his six children."  Id. at 457, 950 N.Y.S.2d at 273.  The dissent concluded that the "hearing court's rejection of [petitioner's] testimony about his motive for pleading guilty was not supported by the evidence adduced at the motion hearing."  Id., 950 N.Y.S.2d at 274.  The justices found the hearing court's conclusions to be "premised on unwarranted speculation that the timing of [the petitioner's] plea was highly significant, that [the petitioner] thought he was sure to be convicted if he went to trial, and that [the petitioner] knew he would be deported if he were convicted."  Id., 950 N.Y.S.2d at 274. The dissenting justices further stated that Justice McLaughlin's finding that petitioner's belief that he would be convicted was not based on the record, but rather his own "unsubstantiated evaluation of the strength of the case against" the petitioner.  Id., 950 N.Y.S.2d at 274.

The petitioner sought permission to appeal to the New York Court of Appeals (R. at 220-24), and received leave to do so on September 21, 2012 (R. at 233).

In his brief to the Court of Appeals, Mr. Hernandez asserted the same claim he raised before the Appellate Division.  (R. at 444-537).  He argued that in <u>Padilla v. Kentucky</u>, 599 U.S. 256 (2010), the Supreme Court modified the prejudice prong of <u>Strickland</u> for cases in which a noncitizen has pled guilty without the benefit of counsel's accurate advice on immigration consequences so that "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." <u>Padilla</u>, 599 U.S. at 372.  The petitioner contended that the Appellate Division's decision to affirm the lower court's factual findings was incorrect, and claimed that the Appellate Division failed to assess whether it would have been rational for him to have rejected the plea offer and proceeded to trial if he had known that it would subject him to deportation.

On November 19, 2013, with two judges dissenting, the Court of Appeals affirmed the order of the Appellate Division.  <u>People v. Hernandez</u>, 22 N.Y.3d 972, 978 N.Y.S.2d 711 (2013).  The Court of Appeals first rejected Mr. Hernandez' claim that <u>Padilla</u> modified <u>Strickland</u>'s "reasonable probability test for prejudice." <u>Id.</u> at 976, 978 N.Y.S.2d at 714 (internal quotation marks omitted).  The court further concluded that "there is support for the lower courts' determination that [petitioner] failed to show a reasonable probability that, if counsel had informed him that he was certain

18

to be deported as a result of his guilty plea, he would not have pleaded guilty and would have gone to trial." Id., 978 N.Y.S.2d at 715.  As a result, the court stated that "the decisions below are beyond our further review and must be affirmed." Id., 978 N.Y.S.2d at 715.  The Court of Appeals did not address whether counsel's advice was constitutionally deficient under the performance prong of the Strickland analysis.

Judge Pigott, joined by Chief Judge Lippman, dissented.  They stated that while Padilla does not set a new standard for prejudice, it "clearly recognizes the importance of considering whether 'a decision to reject the plea bargain would have been rational . . ., when determining whether such a 'reasonable probability' was shown." Id. at 977, 978 N.Y.S.2d at 715 (quoting Padilla, 559 U.S. at 372).  The dissenting judges concluded that, for the reasons set forth in the Appellate Division dissent, "there is no record support for the lower courts' rejection of [the petitioner's] claim that he would have gone to trial and not pleaded guilty had he been warned of the deportation consequences of his plea." Id. at 978, 978 N.Y.S.2d at 716.

The United States Supreme Court denied Mr. Hernandez's petition for a writ of certiorari on April 21, 2014. Hernandez v. New York, ___U.S.___, 134 S. Ct. 1900 (2014).

Mr. Hernandez then filed this petition for a writ of habeas corpus, arguing that he was denied effective assistance of counsel because his trial attorney failed to inform him of the immigration consequences of his guilty plea, and, had he been properly informed, he would have insisted on proceeding to trial.   More specifically, Mr. Hernandez contends that the state court made a series of unreasonable factual determinations in deciding his § 440.10 motion, leading it to erroneously conclude that his attorney's failure was not prejudicial.[5]   (Pet. Memo. at 34-49).

Legal Standards

A. The Antiterrorism and Effective Death Penalty Act

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") governs claims that have been adjudicated on the merits by state courts.   28 U.S.C § 2254(d).   An application for a writ of habeas corpus on behalf of a state prisoner "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" either:

---

[5] The petitioner also states that the state court decision was contrary to Padilla and involved an unreasonable application of clearly established Supreme Court law (Pet. Memo. at 37), but he does not argue legal error independent of the asserted unreasonable factual determinations.  For example, he appears to have abandoned the argument presented in the state appellate courts that Padilla modified the prejudice analysis under Hill v. Lockhart, 474 U.S. 52 (1985).  (Pet. Memo. at 37-49).

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Circuit court decisions "do[] not constitute 'clearly established federal law, as determined by the Supreme Court.'" Renico v. Lett, 559 U.S. 766, 779 (2010) (quoting 28 U.S.C. § 2254(d)(1)). Thus, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington v. Richter, 562 U.S. 86, 102 (2011).

A state court decision is "contrary to" clearly established precedent when the court applies a rule that is "diametrically different," "opposite in character," or "mutually opposed" to the governing law set forth in Supreme Court cases. Williams v. Taylor, 529 U.S. 362, 405 (2000). The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case. Bell v. Cone, 535 U.S.

685, 694 (2002) (internal citations omitted).  The inquiry focuses not on whether the state court's application of clearly established federal law is merely incorrect or erroneous, but on whether it is objectively unreasonable, a substantially higher threshold.  <u>See id.</u> at 694.

"[The] AEDPA instructs that, when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'  The prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'"[6]

---

[6] This is the Supreme Court's most recent pronouncement on the AEDPA standard for state court factual determinations.  However, there is some confusion about the relationship between the "unreasonable determination" standard and the "clear and convincing evidence" standard, and both the Supreme Court and the Second Circuit have repeatedly declined to address the issue.  <u>See</u> <u>Burt v. Titlow</u>, __ U.S. __, __, 134 S. Ct. 10, 15 (2013) (quoting 28 U.S.C. § 2254(d)(2) & (e)(1))("We have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."); <u>Wood v. Allen</u>, 558 U.S. 290, 300-01 (2010) ("Although we granted certiorari to resolve the question of how §§ 2254(d)(2) and (e)(1) fit together, we find once more that we need not reach this question, because our view of the reasonableness of the state court's factual determination in this case does not turn on any interpretive difference regarding the relationship between these provisions. For present purposes, we assume for the sake of argument that the factual determination at issue should be reviewed, as Wood urges, only under § 2254(d)(2) and not under § 2254(e)(1)."); <u>Garguilio v. Heath</u>, 586 F. App'x 764, 766 n.1 (2d Cir. 2014); <u>Jones v. Murphy</u>, 694 F.3d 225, 238 n.4 (2d Cir. 2012). In light of this, some courts have presented the tests as

Burt, __ U.S. at __, 134 S. Ct. at 15.  A determination of fact is not unreasonable because it is merely incorrect -- the standard is "substantially higher."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'"  Wood, 558 U.S. at 301 (second and third alterations in original) (quoting Rice v. Collins, 546 U.S. 333,

---

disjunctive.  See, e.g., Tatum v. Lempke, 481 F. App'x 659, 661 (2d Cir. 2012) (noting that because petitioner challenged state court's finding of fact, "we can only grant [the] petition if we find that (1) the state court's factual determination was unreasonable in light of the evidence presented during the state court proceeding; or (2) [the petitioner] presented clear and convincing evidence that the state court erred in its factual determination." (internal citations omitted)); Haynes v. Burge, No. 05 CV 5997, 2015 WL 791457, at *7 & n.10 (E.D.N.Y. Feb. 25, 2015).  Other courts have found the tests conjunctive.  See, e.g., Winston v. Kelly, 592 F.3d 535, 555 (4th Cir. 2010) (concluding that "§ 2254(d)(2) and § 2254(e)(1) will both ordinarily apply" to habeas petitions); Arroyo v. Lee, 831 F. Supp. 2d 750, 759 (S.D.N.Y. 2011).  The latter approach is more in line with what the Supreme Court has actually said on the subject.  See Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) ("To secure habeas relief, petitioner must demonstrate that a state court's [factual] finding . . . was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court."); see also Burt, __ U.S. at __, 134 S. Ct. at 15; Wood, 558 U.S. at 301 (concluding that, because the state court did not unreasonably determine the facts, there was no need to address "whether that determination should be reviewed under the arguably more deferential standard set out in § 2254(e)(1)").  As with the decisions mentioned above, the instant case does not require me to reconcile the language of § 2254(d)(2) with that of § 2254(e)(1).

341-42 (2006)).   Rather, to meet this standard, a state court's factual determination "must be sufficiently against the weight of the evidence that it is objectively unreasonable."   Winston, 592 F.3d at 554.

A. Ineffective Assistance of Counsel

The petitioner asserts he is entitled to habeas relief because he was denied effective assistance of counsel in violation of his Sixth Amendment rights.   An ineffective assistance of counsel claim is analyzed according to the principles set forth in Strickland, 466 U.S. at 669-70.   Under Strickland, a petitioner must demonstrate (1) that the representation he received "fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688, 694.

The Strickland standard applies to allegations of ineffective assistance in connection with a guilty plea.   Hill, 474 U.S. at 58. Under the first prong of Strickland, "[t]he standard for evaluating the adequacy of counsel's representation is 'a most deferential one.'" Lopez v. Ercole, 588 F. App'x 39, 40 (2d Cir. 2014) (quoting Harrington, 562 U.S. at 105).   Therefore, taken together with the deference a federal habeas court must show to a state court, analysis of whether counsel's representation was objectively

unreasonable is "doubly deferential."   Lopez, 588 F. App'x at 40
(internal quotation marks omitted).   In order to demonstrate
prejudice under the second prong, "the [petitioner] must show that
there is a reasonable probability that, but for counsel's errors,
he would not have pleaded guilty and would have insisted on going
to trial."   Hill, 474 U.S. at 59.

Discussion

    A. Adequacy of Representation

    In Padilla, the Supreme Court held that an attorney
representing a criminal defendant in plea negotiations has an
affirmative duty to advise his client of the immigration
consequences of a conviction, and the failure to provide such
advice deprives the defendant of his Sixth Amendment right to
effective assistance of counsel.[7]   559 U.S. at 367-71. Mr.
Hernandez alleges that his attorney, Mr. Schioppi, failed to tell
him that his guilty plea would make him "automatically deportable."
(Pet. Memo. at 34-37).   Mr. Schioppi acknowledged that he did not

---

    [7] Although the Supreme Court has held that Padilla is not
retroactive, see Chaidez v. United States, __ U.S. __, 133 S. Ct.
1103 (2013), that is no bar here.  The petitioner filed a notice of
appeal from his November 7, 2007, conviction on November 4, 2008
(R. at 23), which the Appellate Division accepted shortly
thereafter. (R. at 22).  The Appellate Division then consolidated
the petitioner's direct appeal with the appeal of his motion to
vacate.  (R. at 119).  The petitioner's conviction became final
when the Supreme Court of the United Stated denied certiorari on
April 21, 2014, Hernandez, __ U.S. __, 134 S. Ct. 1900, long after
the decision in Padilla was rendered.

recall doing so (R. at 358-59), and the state court found that any communication regarding immigration was inadequate to properly inform Mr. Hernandez of the consequences of a guilty plea. (R. at 435). The petitioner has therefore met the first Strickland requirement.

B. Prejudice

To satisfy the Strickland prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Put directly, the question is whether petitioner, had he been apprised of the deportation consequences, would have pled not guilty and gone to trial." Rodriguez v. United States, No. 98 Cr. 0764, 2012 WL 6082477, at *8 (S.D.N.Y. Dec. 4, 2012) (citing Hill, 474 U.S. at 59).

As noted above, the petitioner's argument focuses primarily on the allegedly unreasonable findings of fact on which the state court based its decision. Mr. Hernandez points specifically to the court's assertion that he realized that he was likely to be convicted because "[he] had reached the conclusion that . . . his sister-in-law[] was not going to be deterred from testifying against him as a result of family pressure" (Pet. Memo. at 39; Petitioner's Reply Memorandum of Law ("Reply") at 2, 16-17); to the

court's "surmise[]" that he "knew . . . that he was going to be deported" whether he pled guilty or went to trial (Pet. Memo. at 39); and to the court's adverse credibility determination (Pet. Memo. at 43, 45-46; Reply at 10-15).   He also objects to the court's failure to credit his asserted reason for deciding to plead guilty -- his erroneous belief that the plea would "minimize the time he spent away from his children." (Pet. Memo. at 42; Reply at 10).

Mr. Hernandez argues that the hearing court improperly inferred that he pled guilty because he suddenly realized that C.H. would, in fact, testify against him.  (Pet. Memo. at 39; Reply at 5-6).   According to the petitioner, "there was absolutely no evidence in the record to support the court's conclusion that [his sister-in-law's] intent to testify against [him] was ever even in doubt."  (Reply at 6).  This is a red herring.  To be sure, in finding the timing of Mr. Hernandez's plea significant, Justice McLaughlin stated that "something clearly changed during the lunch period" and hypothesized that "it is well possible that he entertained the hope that [C.H.] would not appear."  (R. at 438). The real issue, however, is the judge's conclusion that Mr. Hernandez realized that the evidence supporting his guilt was "if not overwhelming, then compelling."  (R. at 438).   That Mr. Hernandez knew he was almost certain to be convicted is the

27

linchpin of the state court's finding of lack of prejudice.

The finding was not objectively unreasonable.[8]   Mr. Hernandez's trial was fast approaching. (R. at 438). He had just heard a detective testify as to the petitioner's own statements regarding the events of December 18, 2006 -- statements that, if his later testimony to the § 440.10 court is credited, were untruthful. (R. at 274, 370-72). The record shows that his counsel had just received a witness list that included the complaining witness as well as the petitioner's former wife and his daughter. (R. at 83-84, 393). Whether or not he had held out hope that C.H. would not testify at a trial that the petitioner himself recognized would be a "credibility contest" (Pet. Memo. at 40), these occurrences might well be alarming.

Indeed, the issue of the petitioner's credibility, which he admits would have been paramount at trial, was also important to

---

[8] The petitioner cites a law review article that suggests that "the strength of the evidence against a defendant . . . should not be weighed [] heavily in failure to warn cases" because a fully-informed defendant might rationally reject a plea offer based on a belief that the plea could be re-negotiated to avoid the collateral consequences. (Pet. Memo. at 38 n.7 (citing Jenny Roberts, "Proving Prejudice, Post-Padilla," 54 Howard L. Rev. 693, 737 (2011)). Although I understand the point, it does not indicate that it is an unreasonable application of clearly established law to analyze the strength of the evidence against a defendant who has not been warned about the immigration consequences of a guilty plea. See, e.g., Bhindar v. United States, No. 11 Civ. 3911, 2013 WL 171084, at *5 (S.D.N.Y. Jan. 16, 2013); Francis v. United States, No. 12 Civ. 1362, 2013 WL 673868, at *4 (S.D.N.Y. Feb. 25, 2013).

the state court's decision on his § 440.10 motion.   Like other
factual findings, credibility determinations are entitled to great
weight on habeas review.   See Parsad v. Greiner, 337 F.3d 175, 181
(2d Cir. 2003).   The court found the petitioner's various
protestations of ignorance -- of what it means to testify under
oath or engage in sexual contact, for example -- outlandish and
self-serving.  (R. at 439-40).   Mr. Hernandez objects that these
issues "were not germane to the central issue of the case." (Pet.
Memo. at 45).   But they were germane to the issue of his
truthfulness, which was, in turn central to his likelihood of
succeeding at trial.[9]   Moreover, the state court had before it
instances of conflicting testimony that were unquestionably
pertinent to the case.  The petitioner's account of the events was
inconsistent throughout the proceedings.  He initially claimed in
a written statement that C.H. was asleep when he found her, that he
sought only information from her, and that when she refused, he

---

[9] The petitioner's offered explanations for his ignorance of
the American justice system are unhelpful.  He notes that he was
raised in the Dominican Republic, which has an inquisitorial
judicial system. (Pet. Memo. at 46).  Not only is evidence of Mr.
Hernandez's youth in the Dominican Republic insufficient to render
the state court judge's credibility determination unreasonable, it
is itself undercut by other record evidence.  Mr. Hernandez arrived
in the United States in 1990, and successfully navigated the
country's immigration laws to gain legal permanent residence
status. (R. at 302-03).  Moreover, he had previous contact with
the American justice system when he pled guilty to second degree
assault and subsequently served a sentence of probation.

went to bed.  (R. at 569).  He later alleged that C.H. was awake when he returned and that he tried to oust her from the apartment by grabbing her "between her pants and her blouse" and carrying her to the door.  (R. at 370-72, 380-81).  In addition, he asserted that he had lied when he pled guilty to the sexual assault on C.H. and to the second degree assault on his brother-in-law.  (R. at 378-79, 392).

Along with these inconsistencies that undermine Mr. Hernandez's credibility generally, the state court specifically questioned his testimony regarding his family ties.  Based on his observation of the petitioner and his son, the state court judge doubted Mr. Hernandez's "family fealty." (R. at 439).  Admittedly, the observation was of short duration, and there is some evidence (other than Mr. Hernandez's own statements) that he was a caring parent.  But, in light of the state court's evaluation of Mr. Hernandez's testimony, both in general and in relation to his family, I cannot find that the state court's factual determination on the issue of his credibility was unreasonable.

Justice McLaughlin's determination that Mr. Hernandez actually knew he would be deported rests on shakier ground.  The judge found "as a fact that Mr. Schioppi did speak to [Mr. Hernandez] about immigration," but that the information provided both by his attorney and by the judge himself was insufficient to advise the

30

petitioner of the consequences of a guilty plea.  (R. at 435). Yet, moments later, Justice McLaughlin credited the petitioner with knowledge that "deportation [was] a certainty."  (R. at 438-39). Moreover, nothing in Mr. Hernandez's history suggests that he would independently be aware of the immigration consequences of his guilty plea.  Indeed, as the parties acknowledged in their briefing on the § 440.10 motion, Mr. Hernandez's prior guilty plea rendered him deportable pursuant to 8 U.S.C. § 1227(a)(2)(E).  (R. at 332-33, 346).  There is no indication, however, that immigration authorities ever attempted to deport him based on that conviction. Mr. Hernandez is thus unlikely to have made a connection between a felony conviction and deportation, especially given his status as a legal permanent resident.  Indeed, the only support for the state court's finding appears to be a blanket suspicion of Mr. Hernandez's capacity for truthfulness.

However, even if I were to find that it was objectively unreasonable for the state court to determine that Mr. Hernandez knew that he would be deported as a result of his conviction, it would not help him.  The question a habeas court must ask in evaluating prejudice under Padilla is whether there is a reasonable probability that, had the petitioner been adequately informed of the immigration consequences, he would have rejected the plea and gone to trial.  That is, the court must imagine what the petitioner

would have done if he had known that he would be deported. And this is precisely the analysis in which the state court engaged. It found that Mr. Hernandez, knowing of certain deportation, would have chosen five years of imprisonment rather than risk fourteen years. (R. at 438-39). Given the factual determinations discussed above, that was not objectively unreasonable.

This is a close case which hinges on credibility and factual findings that may be questionable for the reasons recognized by the dissenters in the Appellate Division and Court of Appeals. Nonetheless, given the stringent standard of review imposed by the AEDPA, I cannot recommend granting the petition.

Conclusion

For the reasons set forth above, I recommend that Mr. Hernandez's petition for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, Room 1350, 500 Pearl Street, New York, NY 10007, and to the undersigned, Room 1960, 500 Pearl Street, New York, NY 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       May 8, 2015

Copies transmitted this date:

Bonnie C. Brennan, Esq.
The Legal Aid Society
Criminal Appeals Bureau
199 Water Street, 5th Floor
New York, NY 10038

Priscilla Steward, Esq.
Assistant Attorney General
120 Broadway
New York, NY 10271

33